**ANGELA PIEPER, Individually and as Personal** )
**Representative of The ESTATE OF KRISTEN RENEE** )
**HERNANDEZ, And All Similarly Situated Personal** )
**Representatives of Estates of Deceased Persons** )
**Whose Deaths Were Caused by Toxic Exposure** )     **CIVIL ACTION**
**On or Emanating  From US Army Base Ft. Detrick;** )    **No.: 1:15-cv-02457-WMN**
**8598 Lake Avenue** )
**Grosse  Ile, Wayne County, Michigan  48138** )
    )
**And *For the Use of*** )
**WILFREDO HERNANDEZ** )    **AMENDED CLASS ACTION**
**1741 Hernando Ave** )    **COMPLAINT AND**
**Deltona, FL 32725** )    **JURY CLAIM**
    )
**EMMA HERNANDEZ** )
**1741 Hernando Ave** )
**Deltona, FL 32725** )
    )
**ROBERT ANDREW THOMAS III** )
**11149 Baltimore National Pike** )
**Myersville, Baltimore County, MD 21773** )
    )
**And RANDY WHITE** )
**345 Bayshore Blvd #710** )
**Tampa, FL 33606** )
    )
**<u>USE PLAINTIFFS</u>** )
    )
**LOUISE M. MASON, On Her Own Behalf, and On** )
**Behalf of All Similarly Situated Persons Suffering** )
**From Diseases Caused By Toxic Exposure On or** )
**Emanating  From US Army Garrison,  Ft. Detrick** )
**2583 Bear Den Road** )
**Frederick, Frederick County, Maryland 21701** )
    )
       **And** )
**BRANDON F. WHITE , On His Own Behalf,** )
**and On Behalf of All Similarly Situated Persons** )
**Suffering From Fear of Diseases Caused By Toxic** )

1

**Exposure On   Or Emanating  From US Army**                    )
**Garrison Ft. Detrick**                                        )
**3806 W. San Pedro Street**                                    )
**Tampa, Florida 33629**                                        )
                                                                )
      **Plaintiffs,**             )
                                                                )
 **Vs.**                                                   )
                                                                )
**THE UNITED STATES OF AMERICA;** by and Through )
Its Instrumentalities the DEPARTMENT OF                         )
DEFENSE, the U.S. ARMY And the U.S. ARMY                        )
GARRISON FORT DETRICK,                                          )
                                                                )
     Defendants.                       )
_____/

## AMENDED CLASS ACTION COMPLAINT

### THE PARTIES

1. Plaintiff Angela Pieper is the duly appointed Personal Representative of the late Kristen Renee Hernandez under Letters of Administration issued on March 13, 2012 by Hillsborough County Florida Circuit Court, Probate Division.  Ms. Pieper resides in Grosse Ile, Michigan and brings this action on behalf of the Estate of Kristen Renee Hernandez and on behalf of all similarly situated plaintiffs who are representing deceased persons whose death was caused by exposure to toxic materials, substances, chemicals, groundwater, compounds, wastes and/or byproducts thereof on or emanating from Fort Detrick, Maryland. Persons who are in the subclass personally representing deceased victims are hereafter referred to as Pieper sub-class Members.

2. Plaintiffs Wilfredo Hernandez, a resident of the State of Florida; Emma Hernandez, a resident of the State of Florida; Robert Andrew Thomas III, a resident of Myersville, Maryland; and Randy White, a resident of the State of Florida; are Use Plaintiffs within the applicable definition of the Maryland Wrongful Death and Survival Statutes as pled below.

3. Plaintiff Louise Mason resides in Frederick, Maryland, and brings this action on her own behalf as well as on behalf of all persons similarly situated who have developed diseases and suffer therefrom, which were caused by exposure to toxic materials, substances, chemicals, groundwater, compounds, wastes and/or byproducts thereof on or emanating from Fort Detrick, Maryland. Persons who are alive and suffering from diseases caused by exposure to contaminants from Ft. Detrick are hereafter referred to as Mason Sub-Class Members.

4. Plaintiff Brandon F. White resides in Tampa, Florida, and brings this action on his own behalf as well as on behalf of all persons similarly situated who have been exposed to toxic materials, substances, chemicals, groundwater, compounds, wastes and/or byproducts thereof on or emanating from Fort Detrick, Maryland, and who lives in fear of developing cancer or another disease known to be caused by the toxic materials he was exposed to. Persons who are alive and suffering from fear of contracting cancer or other diseases caused by exposure to contaminants from Ft. Detrick are hereafter referred to as White Sub-Class Members.

5. Defendant the United States of America, by and through its instrumentalities the Department of Defense (DoD), the U.S. Army, the U.S. Army Garrison Fort Detrick, Maryland, and their employees and officials – acting within the course and scope of their employment with Defendant – owns and operates Fort Detrick. Fort Detrick is a U.S. Army Medical Command installation. Historically, Fort Detrick was the center of the United States biological weapons program. Since the discontinuation of that program, Fort Detrick has hosted most elements of the United States biological warfare and defense programs.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action and over the parties pursuant to 28 U.S.C. §§ 1331 and 1346.

7. This action raises Federal Question Subject Matter jurisdiction.

8. Venue is proper in this Court because the acts and omissions complained of occurred in this judicial district. *See* 28 U.S.C. § 1402(b); 42 U.S.C. § 9613(b). Specifically, this Complaint alleges acts and omissions at Fort Detrick, located in Frederick, Maryland

("the Property"), as well as acts and omissions by the United States at the Property, also located in Frederick, Maryland.

9. On various and diverse dates, Plaintiffs filed a Standard Form 95 under the FTCA, with the United States Department of the Army and the U.S. Army Garrison Fort Detrick, Maryland, in accordance with 28 U.S.C. § 2675(a) and 28 C.F.R. Part 14.

10. More than six months having passed since one subclass of Plaintiffs filed their administrative claim, and no final disposition of the claim having been made, the administrative claim may be deemed finally denied for purposes of 28 U.S.C. § 2675(a).

11. Less than six months have passed since one subclass of Plaintiffs who filed their administrative claim, and those claims were denied, and suit is filed within six months of that denial pursuant to 28 U.S.C. § 2675.

## CLASS ALLEGATIONS

12. Plaintiff Class Members shall include all those persons wherever situated in the world under this Honorable Court's jurisdiction who have been exposed to toxic materials, substances, chemicals, groundwater, compounds, wastes and/or byproducts thereof ("Toxics") that originated at Ft. Detrick and either stayed therein or migrated outside that facility, and

   a. Suffered personal injury as a result of that exposure;

   b. Are representative of a person who died as a result of that exposure;

   c. Was exposed to the Toxics and is in reasonable fear of suffering injury thereby and who seeks medical monitoring as a form of damages; and/or

   d. Suffered a nuisance as a result of the exposure to the Toxics.

13. The class is comprised of members that are too numerous to join, rendering joinder impracticable, as the putative class members are currently residents of Maryland, or were at one time residing within proximity to the Property, and may have moved away to different states or nations since being exposed to the Toxics.

14. All class members are joined by a set of common issues and common facts, as alleged in the paragraphs below. These common issues are comprised of exposure to the Toxics and resulting damages caused thereby.

15. Claims which are typical of class members include exposure to the Toxics, Harm resulting from that exposure including personal injury and/or death or a reasonable fear of future symptoms, to be medically monitored. The typical injuries include various cancers, as set forth below, and other disease processes that can be attributed to exposure to the Toxics.

16. Claims asserted by the Class Representatives are typical of members of the Class.

17. Parties and their counsel will fairly and adequately represent and protect the interests of absent class members.

18. Grounds for demanding this class action are based upon and consistent with Fed. R. Civ. P. 23 as follows and as supported in the paragraphs below, factually:

    a. questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

    b. adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications would protect their interests;

    c. The defendant through the DOD, US Army and Ft. Detrick has acted or refused to act on grounds that apply generally to the class in neither accepting nor denying the claims brought under the Federal Tort Claims Act presentment process, 28 U.S.C. § 2675, thereby depriving them of a definitive response to their claim, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; and/or

    d. the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

19. There are two "Main Sub-Classes", each of which consists of three "sub-classes." The two Main Sub-Classes are:

    a. Main Sub-Class A: persons who have filed claims properly within the dictates of the Federal Tort Claims Act and whose claims have been deemed "Denied" by the U.S. Government; and

b. Main Sub-Class B: Persons who have not filed claims as of the filing date of this action but who will so file upon the setting of a date by this Honorable Court, and/or persons who have filed claims but whose claims have neither been deemed "accepted" nor "denied" by the Government.

20. Within the two Main Sub-Classes are three "sub-classes." These are defined as:

a. plaintiffs who are representing deceased persons whose death was caused by exposure to toxic materials, substances, chemicals, groundwater, compounds, wastes and/or byproducts thereof on or emanating from Fort Detrick, Maryland. Persons who are in the subclass personally representing deceased victims are hereafter referred to as "Pieper sub-class members;"

b. persons who are alive and suffering from diseases caused by exposure to contaminants from Ft. Detrick are hereafter referred to as "Mason sub-class members;" and

c. persons who are alive and suffering from fear of contracting cancer or other diseases caused by exposure to contaminants from Ft. Detrick are hereafter referred to as "White sub-class members."

21. Each of the class members has suffered damages As a result of the toxic exposure discussed below.

## **FACTUAL ALLEGATIONS**

### **Background Information**

22. The air, soil and groundwater on the Property has become contaminated – including with trichloroethylene ("TCE") at levels 14 – 42 times the federal maximum contaminant level – as a result of the U.S. Army's negligence in its chemical handling and disposal practices at Fort Detrick. Plaintiffs brings this action to recover damages incident to the tortious acts and omissions of defendant the United States of America ("the United States" or "Defendant") and its instrumentalities, agents, servants, and employees with respect to the United States' historical use and disposal of chemicals and other contaminants at, and failure to adequately and timely prevent, abate, and remediate the contamination and threatened migration of such hazardous substances from, Fort Detrick.

23. The threatened and actual migration of contaminants from Fort Detrick and the United States' belated and insufficient efforts to address such migration have resulted in physical harm to the Plaintiffs', further interfering with their use and enjoyment of their property and causing Plaintiff to incur significant diminution of property value and significant losses related thereto.

24. The three main classes of Plaintiff in this action are those who are representing deceased persons, whose death was attributable to their toxic exposure; those who suffered personal injury including various types of cancer and autoimmune disorders as a result of their exposure; and those who are living in significant fear of developing diseases from being exposed to the Toxics discussed herein.

**The Facility known as Fort Detrick**

25. Fort Detrick is a United States Army Medical Command installation located in Frederick, Maryland. Since its inception in 1931, it has continually been used as the central point in the US biological weapons program.  From 1943 to 1969 it was the home of the biological weapons command, and still remains the preeminent installation for these weapons.  It is a 1200 acre installation.

26. Over the years, Fort Detrick has hosted a multi-governmental community that conducts biomedical research and development, medical materiel management, global medical communications and the study of foreign plant pathogens.  It is home to the U.S. Army Medical Research and Materiel Command (USAMRMC), with its bio-defense agency, the U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID). It also hosts the National Cancer Institute-Frederick (NCI-Frederick) and is home to the National Interagency Confederation for Biological Research (NICBR) and National Interagency Biodefense Campus (NIBC).

27. The Fort is comprised of two "Areas."  Area A was formed by the purchase of five farms, consisting of 800 acres.  This is the main post area of Fort Detrick, where most installation activities are located. "Area B" – known as "The Farm" and consisting of nearly 400 acres – was purchased in 1946 to provide a test area for new weapons which

were to be used as chemical warfare agents.  In addition, the post's water and waste water treatment plants comprise about 16 acres on the banks of the Monocacy River.

28. **Detrick Field (1931–43):** Fort Detrick traces its roots to a small municipal airport established at Frederick, Maryland in 1929. It was first used as an emergency airstrip for flights from Cleveland to Washington, DC.  It was used by the government as a Cadet Pilot Training Center until the country's entry into World War II. Detrick Field was last used as an airfield in December 1941 and January 1942 after the Japanese attack on Pearl Harbor. All aircraft and pilots in the 104th and the cadet program were reassigned after the Declaration of War to conduct antisubmarine patrols off the Atlantic Coast. Thereafter, the base ceased to be an aviation center.

29. **Camp Detrick (1943–56):** On March 9, 1943, the government purchased 154 acres encompassing the original 92 acres and re-christened the facility "Camp Detrick". The same year saw the establishment of the U.S. Army Biological Warfare Laboratories (USBWL), responsible for pioneering research into biocontainment, decontamination, gaseous sterilization, and agent purification.

30. **World War II and BW research (1943–45):**  During World War II, Camp Detrick and the USBWL became the site of intensive biological warfare (BW) research using various pathogens. As an interesting aside, this research was originally overseen by pharmaceuticals executive George W. Merck .

31. Detrick Field was chosen for the site of this exhaustive research effort because of its balance between remoteness of location and proximity to Washington, DC – as well as to Edgewood Arsenal, the center of U.S. chemical warfare research.  The 92 acres of Detrick Field were also surrounded by extensive farmlands that could be procured if and when the BW effort was expanded.

32. The Army's Chemical Warfare Service was given responsibility and oversight for the effort that was cloaked in the deepest wartime secrecy, matched only by the Manhattan Project for developing the Atomic Bomb.  Three months after the start of construction, an additional $3 million was provided for five additional laboratories and a pilot plant.

33. **Post-war years (1946–55):** The elaborate security precautions taken at Camp Detrick were so effective that it was not until January 1946, 4 months after VJ Day that the

public learned of the war-time research in biological weapons.  In 1952, the Army purchased over 500 acres more of land to expand the permanent research and development facilities.

34. The base was the home of some of our government's most dangerous projects.  Proper precautions were not always taken when dealing with potentially lethal products.  Two workers at the base died from exposure to anthrax in the 1950s. Another died in 1964 from viral encephalitis.

35. One building, Building 470 is locally referred to as "Anthrax Tower." This was a pilot plant for testing optimal fermentor and bacterial purification technologies. The information gained in this pilot plant shaped the fermentor technology that was ultimately used by the pharmaceutical industry to revolutionize production of antibiotics, vaccines and other drugs.  Building 470 was razed in 2003 without any reported adverse effects on the demolition workers or the environment.

36. The facility acquired the nickname "Fort Doom" while offensive biological warfare research was undertaken there.  5,000 bombs containing anthrax spores were produced at the base during World War II.

37. From 1945 to 1955 under Project Paperclip and its successors, the U.S. government recruited over 1,600 German and Austrian scientists and engineers in a variety of fields such as aircraft design, missile technology and biological warfare.

38. Among the specialists in the latter field who ended up working in the U.S. were Walter Schreiber, Erich Traub and Kurt Blome, who had been involved with medical experiments on concentration camp inmates to test biological warfare agents.  Since Britain, France and the Soviet Union were also engaged in recruiting these scientists, the Joint Intelligence Objectives Agency (JIOA) wished to deny their services to other powers, and therefore altered or concealed the records of their Nazi past and involvement in war crimes.

39. The U.S. General Accounting Office issued a report on September 28, 1994, which stated that between 1940 and 1974, DOD and other national security agencies studied hundreds of thousands of human subjects in tests and experiments involving hazardous substances.

40. According to that study, many experiments that tested various biological agents on human subjects, referred to as Operation Whitecoat, were carried out at Fort Detrick, Maryland, in the 1950s. The human subjects originally consisted of volunteer enlisted men. However, after the enlisted men staged a sit-down strike to obtain more information about the dangers of the biological tests, Seventh-day Adventists [SDAs] who were conscientious objectors were recruited for the studies.

41. The Army purchased an additional 147 acres in 1946 to increase the size of the original "Area A" as well as 398 acres located west of Area A, to provide a test area known as Area B. In 1952, another 500 acres were purchased to expand the permanent research and development facilities.

42. The biological warfare program at Ft. Detrick began to research the use of insects as disease vectors going back to World War II and also employed German and Japanese scientists after the war who had experimented on human subjects among POWs and concentration camp inmates.

**43.** Scientists used or attempted to use a wide variety of insects in their biowar plans, including fleas, ticks, ants, lice and mosquitoes – especially mosquitoes that carried the yellow fever virus. They also tested these in the United States.

**44.** The U.S. deployed these insects dropped from aircraft during the Korean War to spread diseases, claiming that the Chinese and North Koreans were engaged in a propaganda campaign when they made these allegations.  The Joint Chiefs of Staff and Secretary of Defense had approved their use in the fall of 1950 at the "earliest practicable time."  At that time, it had five bio warfare agents ready for use, three of which were spread by insect vectors.

45. **Cold War Years (1956 – 1989):**  Camp Detrick was designated a permanent installation for peacetime biological research and development shortly after World War II, but that status was not confirmed until 1956, when the post became Fort Detrick. Its mandate was to continue its previous mission of biomedical research and its role as the world's leading research campus for biological agents requiring specialty containment.

46. President Richard M. Nixon asked the Senate to ratify the 1925 Geneva Protocol prohibiting the use of chemical and biological weapons on November 11, 1969.

47. Nixon assured Fort Detrick's research would continue. On November 25, 1969, offensive biological research was outlawed in the United States. Since that time any research done at Fort Detrick has been purely defensive in nature, focusing on diagnostics, preventives and treatments for BW infections. This research is undertaken by the U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID) which transitioned from the previous U.S. Army Medical Unit (USAMU) and was renamed in 1969.

48. In 1989 base researchers identified the Ebola virus in a monkey imported to the area from the Philippines and conducted deep research into that disease at that time.

49. **Post Cold War 1990 – Present:** USAMRIID had been the principal consultant to the FBI on scientific aspects of the 2001 Anthrax Attacks, which had infected 22 people and killed five. While assisting with the science from the beginning, it also soon became the focus of the FBI's investigation of possible perpetrators.

50. In July of 2008, , a top U.S. biodefense researcher at USAMRIID committed suicide just as the FBI was about to lay charges relating to the incidents. The scientist who had worked for 18 years at USAMRIID, had been told about the impending prosecution.

51. In June 2008 the Environmental Protection Agency said it planned to add the base to the Superfund list of the most polluted places in the country. In April 2009, "Fort Detrick Area B Groundwater was added to the list.

**Historical Disposal Activities on Base.**

52. The United States is liable for these injuries under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*., which renders the United States liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

53. Fort Detrick comprises three non-contiguous tracts of real property, referred to as Areas A, B, and C. Area A occupies approximately 800 acres and contains office buildings, warehouses, laboratories, agricultural fields, family housing, and other military facilities. Area B, also referred to as "The Farm," occupies approximately 399 acres located about 0.5 miles west of Area A, and contains landfills, test areas, an abandoned firing range,

and other facilities. Area C consists of two small areas, approximately 16 acres in combined size, three miles east of Area A.

54. Disposal activities at Area B are described in a document known as the Federal Facility Agreement for Fort Detrick. Federal facilities are required to enter into a Federal Facility Agreement with the U.S. Environmental Protection Agency ("EPA") if they are placed on the National Priorities List ("NPL") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq*. The Federal Facility Agreement establishes provisions and timetables governing site investigation and cleanup at each listed federal facility. Fort Detrick's Federal Facility Agreement specifically addresses the U.S. Army's obligations under both CERCLA and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*., arising out of hazardous substance releases at Fort Detrick. It requires the Army, among other things, to implement Remedial Investigations and Feasibility Studies and to comply with procedures for selecting and carrying out remedial action at specified locations known as "Operable Units," including Area B Groundwater and chemical waste disposal pits at Area B.

55. As described in the Federal Facility Agreement, Area B was historically used as "a proving ground in the Army's biological warfare program." It also served as the "primary location for Fort Detrick's waste management activities;" as such, it was used to dispose of such biological, radiological, and chemical materials as sterilized anthrax, radiological tracer materials, the lethal chemical agent phosgene, industrial waste, herbicides, and defoliants including known carcinogens in their formulation.

56. According to numerous U.S. Army reports, Area B-11 is believed to be the primary source of volatile organic compound ("VOC") contamination in Area B groundwater and surface water.

57. While actively used as a disposal area, Area B-11 contained numerous unlined trenches and burial pits. These pits were not systematically numbered, their locations were not accurately documented, and individual pits were used for a number of different waste disposal purposes.

58. Pits 1 through 7 within Area B-11 were used to dispose of metals, wood, and general waste from Fort Detrick. Additionally, from 1970-76, the carcasses of laboratory animals were buried in Pit 3.

59. Pits 8 through 10 within Area B-11 were used to dispose of refuse from the Fort Detrick family housing areas and bedding material from Fort Detrick's normal animal farm operations.

60. According to the US Army Corps of Engineers, Pit 11 within Area B-11 received "all types of acids and chemical waste from Fort Detrick, the U.S. Bureau of Standards, and Walter Reed Army Medical Center . . . from 1955 to 1970." By way of example, up to three 32-gallon garbage cans of chemical waste were disposed of in Pit 11 each week during Pit 11's use as a disposal area. Additionally, eight 55-gallon drums of TCE were reported to have been buried in Area B, most likely in Area B-11 Pit 11, in 1968. On information and belief, these drums of TCE are one source of the contamination to Plaintiff's Property. In addition, two cylinders of phosgene may also have been buried in the area at an unknown date.

61. Two pits within Area B-11, collectively referred to as Pit 12, were used to dispose of 150 tons of liquid waste in 1972, including 25 tons of sludge removed from decontamination holdings tanks at Area A.

62. Pit 13 within area B-11 was used as a burial site for incinerated toxic waste from Fort Detrick's demilitarization operations.

63. According to at least one environmental report, Pit 14 within Area B-11 received "large amounts" of herbicides and insecticide waste between 1965 and 1971. Upon information and belief, in 1970-71 alone, Pit 14 received approximately 800 gallons of such liquid waste and 600 pounds of such solid waste.

64. Pit 15 within Area B-11 received waste from autoclaved, incinerated animal carcasses from Fort Detrick's biological agent testing program.

65. Pit 16 within Area B-11 reportedly received unknown amounts of radioactive carbon, sulfur, and phosphorous compound wastes between 1955 and 1971.

66. With the termination of the government's offensive biological weapons program, the United States undertook a "decontamination and certification program at Fort Detrick"

in 1970 and 1971. Upon information and belief, incineration ash from the decontamination process was tilled into the soil in Area B's northwestern corner. In addition, in 1977, buried scrap metals were uncovered as a result of soil erosion at Area B.

67. At the time that the U.S. Army carried out the foregoing waste disposal activities in unlined trenches and pits in Area B-11 from the 1950s through the 1970s, the responsible Army officials knew or reasonably should have known that these wastes contained chemical and other hazardous constituents that would migrate off-site and adversely affect the health, lives and well being of neighboring property owners, civilian residents, and the environment. The releases of hazardous substances which are now threatening and harming Plaintiff's Property are the direct result of Defendant's past waste disposal activities in Area B-11 at Fort Detrick, and Defendant's failure to timely investigate, abate, and remediate known and suspected contamination.

68. The foregoing waste disposal activities violated the Army's own mandatory regulatory duties, as alleged below.

**Inaction of the Defendants.**

69. Despite its awareness of the above activities and the obvious potential for contamination, the Army did not begin to investigate or evaluate contamination at Fort Detrick resulting from its historical disposal practices until November 1976, when the U.S. Army Office of the Project Manager for Chemical Demilitarization and Installation Restoration ("PM CDIR") initiated an Installation Contamination Assessment of Fort Detrick.

70. The PM CDIR's report found that "[t]he records and historical operations suggest that Area B [wa]s contaminated with CBR [chemical, biological, and radiological] material," and "*that a high potential for contamination migration exists.*

71. Following issuance of the PM CDIR's Installation Contamination Assessment report, an *ad hoc* U.S. Army review committee, composed primarily of representatives from the agencies responsible for both past and continuing activities at Fort Detrick, was convened to issue recommendations with respect to any additional field work.

72. With respect to Area B, the *ad hoc* committee expressly recommended against conducting "a preliminary survey . . . to assess the risk of migration of biological contamination or to detect migration of laboratory chemicals [from Fort Detrick]." The committee instead recommended only that "existing wells and water courses be monitored for herbicides

73. In making this recommendation against further action, the *ad hoc* committee made no reference to any of the mandatory authorities that governed the Army's conduct with regard to such environmental matters, discussed *infra,* and apparently ignored them.

74. The ad hoc committee did, however, acknowledge that its recommendations ran contrary to the conclusions and recommendations of the PM CDIR Records Research Review Team, which had found that "*contaminated wastes were disposed of in such a manner as to indicate a high potential for migration of hazardous materials beyond the boundaries of the installation*." The ad hoc review committee emphasized the "expensive and time consuming" nature of any follow-up survey, while noting that no migration had yet been detected despite the fact that "*the subterranean structure of Fort Detrick would allow rapid and easy migration."*

75. The Office of the Army Surgeon General ("OASG") approved the ad hoc committee's findings in August 1979. In approving these recommendations, the OASG also made no reference to any of the mandatory authorities that governed the Army's conduct with regard to such environmental matters, discussed below.

76. In 1981, EPA Region III performed a Field Investigation of Uncontrolled Hazardous Waste Sites/Preliminary Assessment of Fort Detrick and concluded "that Area B may have been the disposal area for biological, chemical, radioactive, industrial, and munitions waste."

77. Over three decades ago, in 1981, the EPA recommended that the State of Maryland and EPA monitor any Army investigations "to address the potential for off-site migration of toxic materials and to delineate the potential hazards related to the possible presence of anthrax cysts in the soil."

78. Also in 1981, the Fort Detrick Director of Facilities and Engineering inexplicably represented to an EPA investigation team that "no problem exists at the Fort"; that, in his view, EPA's concerns about potential contamination at Fort Detrick were "blown out

of proportion"; and that "[o]nly sanitary wastes were buried at Ft. Detrick." As discussed above, this last point was demonstrably false in light of the Army's own internal 1977 report to the Commander of Fort Detrick that there was a "high potential for migration of hazardous materials beyond the boundaries of the installation."

79. In October 1982, representatives of the EPA and MDE conveyed to Fort Detrick officials their conclusion "that *human error in Fort Detrick safety procedures* may have allowed harmful levels of hazardous biological organisms and chemicals to be buried in Area B."

80. However, despite such notice of contamination and the risk of off-site migration, until at least 1988, the United States conducted little, if any, documented activity to investigate the existence of and potential for off-site migration of contamination resulting from the historical disposal of chemical, biological, radioactive, or other wastes at Area B.

81. In the early 1990s, Fort Detrick began performing quarterly sampling of groundwater wells in accordance with State Landfill permit requirements for Area B.

82. A February 1992 sampling event revealed TCE concentrations above Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, maximum contaminant levels ("MCL"), as well as elevated levels of trichlorofluoromethane ("TCFM") in a well in Area B.

83. In October 1992, MDE also "sampled 21 residential wells in the vicinity of Fort Detrick Area B and found TCE concentrations above the MCL in four wells" located along a roadway outside Area B's southeastern edge.

84. A number of documents related to proposed remedial investigation at Fort Detrick were developed in the mid-1990s. These included:

   a. U.S. Army Corps of Engineers, Final Site Health and Safety Plan, Fort Detrick Remedial Investigation (May 1994);

   b. U.S. Army Corps of Engineers, Final Quality Assurance Project Plan – Fort Detrick Remedial Investigation (May 1994); and the

   c. U.S. Army Corps of Engineers, Final Sampling Design Plan, Fort Detrick Remedial Investigation (July 1994).

85. Many of these documents include an overview of the historical chemical, biological, and radiological waste disposal practices at Fort Detrick, and give no indication that these

disposal practices were performed in accordance with the mandatory authorities that governed the Army's conduct with regard to such environmental matters, discussed below.

86. Additional sampling in the ensuing years produced further evidence of off-site migration of VOCs, including TCE and perchloroethylene ("PCE"). For example, a May 1998 work plan addendum revealed that TCE and PCE had been detected in concentrations of 5,000 µg/L and 20,000 µg/L respectively – exponentially higher than the MCLs of 5 µg/L for both TCE and PCE – in well water and groundwater outside the southeastern boundary of Area B.

87. The Army also admitted that "the elevated detections of TCE along the southwestern boundary of Area B suggest the possibility of contaminated groundwater off-site in the aquifer underlying the cultivated property to the south of Area B." However, no remedial or removal action was taken in response to these sampling results. Both TCE and PCE are "hazardous substances" under CERCLA, as are other contaminants which were disposed of at Area B.

88. Between 1999 and 2000, TCE and PCE were again detected off-site, often in concentrations above MCLs, in wells at Robinson Spring and Hospital Spring, both located to the southeast of Area B. PCE was also detected in a well located at 1990 Shookstown Road, to the east of the Property. Again, no remedial or removal action was taken in response to these sampling results.

89. A 2000 report recognized a continued risk that groundwater contaminated with TCE and PCE, among other contaminants, could migrate or was migrating off-post as a result of Fort Detrick's historical disposal practices at Area B-11. The report noted: "The buried materials in Area B-11 are assumed to be the source of the [TCE] and [PCE] detected in groundwater wells in Area B and off-site. Contaminants in the vadose zone have the potential to migrate to groundwater and be transported to streams, including Carroll Creek, located downgradient of the site. *Actual or impending releases of site-related contaminants, if not addressed by implementing the response action selected in this EE/CA, may present an unnecessary and avoidable risk in public health or welfare, and/or the environment*." But again, inexplicably, the Army took no remedial or

removal action in response to these sampling results and the conclusions derived therefrom.

90. Other sampling and investigations in the early 2000s continued to detect TCE and PCE in groundwater beyond the boundaries of Fort Detrick, in some cases in excess of MCLs. The United States generally interpreted these test results as "suggest[ing] that the center of mass for the VOC plume is moving from west to east across Area B."

91. The sampling data also revealed that "*because TCE was detected in a residential well located on the southeastern portion of Shookstown Road . . ., the plume may extend as far south as the location of this well*."

92. Despite the above-referenced (and other) investigations, sampling events, and reports since the initial 1977 assessment – all of which continued to identify contamination, including contaminated groundwater, at Area B and nearby locations – Defendant took no measures to address this contamination or prevent and mitigate the threatened off-site migration of hazardous substances from Fort Detrick onto nearby lands and into nearby households.

93. Between 2001 and 2004, the U.S. Army Corps of Engineers completed a limited removal action at Area B-11 to remove contaminated soil, chemical containers, compressed gas cylinders, and laboratory waste from the site.

94. This removal action revealed that numerous unmarked, unlabeled containers, drums, barrels, and other chemical, biological, and/or radiological waste receptacles had been buried within Area B-11. Vials containing live pathological bacteria were also revealed to have been disposed of at the site.  One report even noted that  "Soil samples from the bottom of the pit excavations contained TCE, PCE, and polychlorinated biphenyls (PCBs). According to the Army, the excavated areas were backfilled with clean soil, and the entire area was covered with clean soil and seeded." However, "[b]ecause of the potential of finding live biological materials in other disposal areas, a prohibition on future intrusive activities in waste areas was instituted due to the complex safety requirements and associated costs."

95.  The 2001-2004 limited removal action did not include any action to address the identified contaminated groundwater. Nor did Defendant undertake any other action to

remediate continuing migration of hazardous substances in groundwater. Thus, Defendant failed to take prompt remedial action despite Defendant's knowledge that hazardous substances had migrated off-site at least since 1992.

96. To date, despite Defendant's undeniable notice of groundwater contamination, no action has yet been taken to remediate past and continuing groundwater contamination caused by Defendant's disposal of contaminants at Fort Detrick. The migration of contaminants as a result of Defendant's historical waste disposal practices at Fort Detrick, including Defendant's disposal of VOCs in Area B-11, and Defendant's failure to prevent and remediate migration of contaminants to the Property, are in violation of the mandatory authorities governing the Army's conduct with regard to such matters, and have resulted in continuing injury to Plaintiff class members.

**Government Agencies Show Concern but are Met With Further Inaction**

97. Fort Detrick Area B Ground Water was added to the CERCLA National Priorities List in April 2009. As a result of this listing, since February 2008, "the Army has been partnering with the MDE and EPA to form consensus on data gaps and additional fieldwork that will be required to define the nature of the groundwater flow beneath Area B and to complete [a Remedial Investigation]." Pursuant to a July 2010 work plan for the Remedial Investigation, the Army plans to conduct additional sampling for potential contaminants not previously studied.

98. As part of the remedial investigation, the Army and one or more of its contractors have installed groundwater monitoring wells and perform additional sampling on neighboring properties. The U.S. Government notified neighbors that it is likely that the groundwater contaminant plume extends beneath their property."

99. In addition to the above enumerated attempts by various government agencies to regulate and remediate the toxic damages and dangers set forth above, there have been a series of Executive Orders issued by various Presidents of the United States, aimed at directing the DoD and its various branches of military to stop contaminating the environment and to clean it up. These Executive Orders started with President Lyndon B. Johnson and have continued through the years. The DoD and in particular, Ft. Detrick have not even attempted to comply with those Orders from the Commander in Chief.

## COUNT ONE

100.    The Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

101.    As set forth above, the Government withheld crucial information from members of the class, and this failure to advise the public of the conditions at Ft. Detrick set forth above, has acted to obscure the cause of various class members' injury.

102.    This delay in information has [resented various class members from being able to discern the cause of or the party responsible for their injury, or the injury to their decedent.

103.  It would be manifestly unfair to penalize class members for not knowing that the U.S. Government was responsible for causing their injuries, where the Government failed to properly apprise citizens of the Toxics, or their source.

104.  Cases must be allowed to proceed through this class under the doctrine of equitable tolling, as a result of the failures hereinabove described.

## COUNT TWO

105.  Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

106.  The Defendant had a duty to maintain its property in such a way as to not cause harm to people on or around that property, and to act with due care in the handling, use and disposal of Toxics, as discussed above.

107.  The Defendant breached that duty by improperly, recklessly and negligently handling various Toxics, including without limitation, Agent Orange, dioxin, radioactive materials, anthrax, Ebola, tetrachloroethene (PCE), and trichloroethene (TCE) and allowing those Toxics to contaminate the Property and the vicinity surrounding Ft. Detrick.

108.  The defendants negligent acts caused the Plaintiffs to be exposed to the above named Toxics, and that exposure caused the various diseases and fears suffered by the Pieper, Mason and White sub-class members.

109.  As a result of their exposure which caused the diseases and fears suffered by the members of the class and its three subclasses, the Plaintiffs suffered damages and losses.

## COUNT THREE

110.  Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

111.  Because of the acts complained of above, the members of the Pieper sub-class are claiming damages for wrongful death under the appropriate Maryland Wrongful Death Statutes.

112.  Pieper Plaintiffs each bring a claim for wrongful death pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-904.

113.  The defendants have acted with negligent disregard for the lives of those represented by the  Pieper Plaintiffs as set forth above.

## COUNT FOUR

114.  Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

115.  Pieper Plaintiffs as personal representatives of the estate of those they represent brings this cause of action pursuant to Md. Code Ann., Estates and Trusts § 7-401.

116.  As a direct and proximate result of the aforementioned negligence of the Defendants, the Pieper Plaintiffs, as personal representatives seek all damages, economic and non-economic as allowed by law.

## COUNT FIVE

117.  Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

118.  Because of the acts complained of above, the members of the Mason sub-class are claiming damages for Pain and Suffering.

## COUNT SIX

119.  Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

120.  Because of the acts complained of above, the members of the White sub-class have been exposed to the Toxics because of the defendant's tortious conduct.

121.  As a result of that exposure, members of the White sub-class have an objective and reasonable fear that they will contract a disease.

122. As a result of that fear, they have manifested a physical injury capable of objective determination.

123. Members of the White sub-class are entitled to damages.

## COUNT SEVEN

124. Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

125. The defendant knew or should have known that the Toxics on its property were unreasonably dangerous and the experimentation with chemical and biological warfare agents was an unavoidably unsafe act.

126. The defendant utilized unreasonably dangerous and potentially lethal Toxics in its daily activities, and failed to take proper steps to protect the members of the public, including all class members herein. Even if it were to have taken steps to safeguard persons such as the Plaintiffs, there was still a high likelihood of harm from the activities.

127. It was inappropriate to develop chemical and biological warfare weapons within a close proximity to a civilian population center.

128. Those unreasonably dangerous Toxics, fumes from them, contamination from them and other properties of them caused harm to nearby persons and were unreasonably dangerous to the Plaintiffs.

129. Those Toxics caused harm to the Plaintiffs.

130. The defendant should be held strictly liable to the Plaintiff class members.

## COUNT EIGHT

131. Plaintiffs repeat and reaver all content hereinabove, as if specifically pled in this count, and add the following.

132. The acts and omissions complained of hereinabove are of such character as to expose the defendant to liability in tort. The activities undertaken insofar as the handling of dangerous Toxics were not unique functions and responsibilities of the government, and the Toxics that caused the injuries complained of in this complaint are the basis of negligence claims in the performance of a function such as those performed by private citizens rather than in the broad policy-making duty of the government.

**PRAYER FOR RELIEF**

**WHEREFORE** The Plaintiffs demand the following relief:

1. That this Honorable Court Certify this case as a Class Action, pursuant to F.R. Civ. P 23.

2. That this Honorable Court ORDER the defendant to clean up the grounds on and surrounding Garrison Ft. Detrick in Frederick, Maryland.

3. That this Honorable Court find the defendant liable for its negligent acts and award damages as sought below.

4. That this Honorable Court find the defendant strictly liable in tort for the injuries it has caused as a result of carrying out unavoidably unsafe activities on its property.

5. That this Honorable Court enter judgment in the amount of Seven Hundred and Fifty Million ($750,000,000.00) Dollars, or an amount it deems just to compensate members of this class.

6. That this Honorable Court allow a Medical Monitoring Class to proceed and order that funding be put in place for the benefit of all Mason and White sub-class members.

7. That this Honorable Court assess attorney's fees and costs for class counsel, in a fair and equitable manner.

8. That this Honorable Court take such other action as it deems just.

**PLAINTIFFS DEMAND TRIAL BY JURY**

Dated:    August 19, 2015                    RESPECTFULLY SUBMITTED
                                             The Plaintiffs
Of Counsel:                                  By their Attorneys,


  /s/ Michael R. Hugo                        /s/ Jonathan B. Nace
Michael R. Hugo *(Pro Hac Vice to be filed)*   Jonathan B. Nace # 18246
LAW OFFICE OF HUGO & ASSOCIATES LLC          PAULSON & NACE, PLLC
One Catherine Rd.                            1615 New Hampshire Ave., NW
Framingham, MA 01701                         Washington, DC 20009
Tel: (617) 448-4888                          Tel: (202)463-1999
Fax: (617)607-9655                           Fax: (202)223-6824
mike@hugo-law.com                            jnace@paulsonandnace.com

**CERTIFICATE OF SERVICE**

This is to certify that on this 3rd day of September, 2015, I caused a copy of the foregoing Amended Class Action Complaint to be served upon the court via ECF.


/s/ Jonathan B. Nace
Jonathan B. Nace # 18246