IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Angela Pieper, *et al*. | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-15-2457 |
| | : | |
| | : | |
| The United States of America | : | |
| | : | |

**<u>MEMORANDUM</u>**

The plaintiffs, on behalf of themselves and others similarly situated, sue the United States under the Federal Tort Claims Act ("FTCA") for negligence involving its waste disposal and remediation practices at Fort Detrick. The United States filed a motion to dismiss for lack for subject matter jurisdiction on the grounds that the plaintiffs' claims fall within the FTCA's discretionary function exception ("DFE"). For the reasons stated below, the motion to dismiss will be granted.

**BACKGROUND**

The plaintiffs allege environmental contamination and associated personal injuries caused by "the United States' historical use and disposal of chemicals and other contaminants at, and failure to adequately and timely prevent, abate, and remediate the contamination and threatened migration of such hazardous substances from, Fort Detrick." (Am. Compl. ¶ 20, ECF No. 13.) The three classes of plaintiffs are representatives of people who died from toxic exposure, people who have suffered from personal injuries as a result of their exposure to contaminants, and people who fear developing diseases from exposure. (*Id*. at ¶ 22.) The plaintiffs' claims arise out of the Army's disposal of trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), and other

substances at Fort Detrick's B-11 landfill and the remediation of the groundwater under Area B. (*Id*. at ¶¶ 50-97.)

During World War II, Fort Detrick was the center of the United States' biological warfare program. (Curtis Decl. ¶ 8, Mot. Dismiss Ex. 1, ECF No. 20-4.) That program stopped in 1969 when President Richard Nixon issued a United States policy renouncing offensive biological warfare and directing the Department of Defense ("DoD") to dispose of existing biological warfare weapons and to confine research to defensive initiatives. (*Id*. at ¶ 10.)

The Army used TCE and PCE as part of its biological warfare program at Fort Detrick. (*Id*. at ¶ 13.) From 1955 until 1970, the Army disposed of various chemicals, including TCE and PCE, in Area B-11 by burying them in unlined pits, which was the standard disposal practice at the time. (*Id*. at ¶¶ 11, 14, 16-17; Ford Report 30, Mot. Dismiss Ex. 4, ECF No. 20-7.) The Army stopped disposing of hazardous chemicals in Area B-11 in the early 1970s. (Curtis Decl. ¶¶ 15-18.)

In 1975, the DoD began investigating and remediating environmental contamination at military installations under the Installation Restoration Program ("IRP"). (2000 Annual Report 2, Mot. Dismiss Ex. 18, ECF No. 20-21; Contamination Assessment 1, Mot. Dismiss. Ex. 27-1, ECF No. 20-38.) That same year, the Army began publishing Army Regulation 200-1, on Environmental Protection and Enhancement, which "provide[d] general guidance to elements within the Department of the Army on environmental protection" and "prescrib[ed] policies, responsibilities, and procedures for the protection and preservation of environmental quality for the Department of the Army in peacetime." (Army Regulation 200-1 (1975), Mot. Dismiss Ex. 26-1, ECF No. 20-32.)

In 1980, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which "require[d] responsible parties to clean up releases of hazardous substances to the environment." (2000 Annual Report 2.)  In 1986, the Superfund Amendments and Reauthorization Act ("SARA") expanded CERCLA and established the Defense Environmental Restoration Program ("DERP") to address the release of hazardous substances at DoD facilities, and IRP became a part of that program. (2007 Annual Report 9, Mot. Dismiss Ex. 19, ECF No. 20-22.) The amendments were accompanied by a CERCLA regulation that clarified that the federal government's responses to environmental hazards were "discretionary governmental functions" and that CERCLA did not "create any duty of the federal government to take any response action at any particular time." 40 C.F.R. § 300.400(i)(3) (originally found at 40 C.F.R. § 300.61(e)(3) (1986)).

The Army first installed monitoring wells to characterize groundwater conditions near the Area B disposal areas in 1974. (Area B Groundwater Remedial Investigation Work Plan § 2.7.1.1, Mot. Dismiss Ex. 14, ECF No. 20-17.) In 1981, a Task Report to the Environmental Protection Agency ("EPA") reported that Fort Detrick was installing a monitoring well network "to determine if any toxic materials are migrating." (Task Report 5, Mot. Dismiss Ex. 3, ECF No. 20-6.) The Task Report recommended that the State of Maryland and the EPA continue to monitor the Army's investigations and that the Army "should" initiate a remedial action program "[i]f these investigations indicate potential hazards." (*Id*.)

Around 1991, monitoring wells detected TCE contamination at Area B, prompting an environmental restoration effort that continues to this day. (Gortva Decl. ¶ 7, Mot. Dismiss Ex. 5, ECF No. 20-8.) In 1992, the Maryland Department of the Environment sampled 21 offsite

3

residential wells near Fort Detrick and detected TCE above the maximum contaminant level in four of those wells. (Federal Facility Agreement § 6.10, Mot. Dismiss Ex. 15, ECF No. 20-18.) The Army immediately supplied residents with an alternative water source. (Gortva Decl. ¶ 11; Public Health Assessment 1, Mot. Dismiss Ex. 22, ECF No. 20-28.)

In 1997, the Army confirmed that TCE and PCE had contaminated groundwater under neighboring land. (Gortva Decl. ¶ 19.) The Army determined that the "best removal action to protect human health and the environment" was to address the contamination by "remov[ing] the primary source of the groundwater contamination in Area B, thereby preventing future releases." (2000 Area B-11 Decision Document § 1.4, Mot. Dismiss Ex. 9, ECF No. 20-12.) The "primary source" of contamination was the waste disposal pits in Area B-11. (*Id*. at § 1.3.) The Army conducted a $25 million interim removal action, which successfully reduced TCE and PCE concentrations in Area B groundwater. (Gortva Decl. at ¶¶ 25-26; *see also* Remedial Investigation § 4.2.1, Mot. Dismiss Ex. 10, ECF No. 20-13.)

After the interim removal action, the Army decided against further intrusive activities in the waste disposal pits because of complex safety requirements and the expense of further excavation and disposal, which it estimated at nearly one billion dollars. (2009 Decision Document § 2.10.7, Mot. Dismiss Ex. 13, ECF No. 20-16; Federal Facility Agreement § 6.11.) In 2008, the Army decided to install protective caps as a containment measure. (Remedial Investigation/Feasibility Study § 1.0, Mot. Dismiss Ex. 12, ECF No. 20-15; 2009 Decision Document § 1.4.) The caps cost the Army $5.5 million, which the Army found "represents a reasonable value" because the caps provide a "significant increase in protection of human health and the environment." (2009 Decision Document § 2.13.3.)

In 2009, the EPA added Area B Groundwater to the National Priorities List, which means the EPA, instead of the Maryland Department of the Environment, has acted as the lead regulator of Area B since then. (Gortva Decl. ¶¶ 34-35; Federal Facility Agreement § 6.18.) In December 2010, the Army and the EPA completed negotiations on the Fort Detrick Federal Facility Agreement, which outlines their respective responsibilities and allows the Army to continue its ongoing remedial investigation of Area B. (Gortva Decl. ¶¶ 38-39; Federal Facility Agreement § 9.1.)

## ANALYSIS

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009). The plaintiff bears the burden of proving that subject matter jurisdiction exists. *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008). Moreover, "[w]hen a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings . . . ." *Blitz v. Napolitano*, 700 F.3d 733, 736 n.3 (4th Cir. 2012) (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

The plaintiffs bring this lawsuit under the FTCA, which constitutes a "limited waiver" of the United States' sovereign immunity. *Molzof v. United States*, 502 U.S. 301, 305 (1992). The FTCA makes the federal government liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. But this waiver is

"subject to several exceptions." *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006). One of these exceptions is the discretionary function exception ("DFE"), under which the United States is not liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The plaintiffs "bear the burden of proving that the discretionary function exception does not apply" to the United States' conduct. *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009).

The DFE analysis proceeds in two steps. First, a court must determine "whether the challenged conduct 'involves an element of judgment or choice.'" *Suter*, 441 F.3d at 310 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). No such discretion exists when "'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Indem. Ins. Co.*, 569 F.3d at 180 (quoting *Berkovitz*, 486 U.S. at 536). Second, even if the challenged conduct involves an element of judgment, a court must determine "'whether that judgment is of the kind that the discretionary function exception was designed to shield,' i.e., whether the challenged action is 'based on considerations of public policy.'" *Suter*, 441 F.3d at 311 (quoting *Berkovitz*, 486 U.S. at 536-37). This inquiry focuses "not on the agent's subjective intent in exercising the discretion . . . , but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). In other words, a court "look[s] to the nature of the challenged decision in an objective, or general sense, and ask[s] whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993).

A government agent's acts are presumed to be "grounded in policy" when that agent uses discretion provided by statute, regulation, or agency guideline. *Gaubert*, 499 U.S. at 324. Accordingly, if the plaintiffs have shown that the Army either (1) lacked discretion regarding its waste management practices or (2) made waste management decisions of the kind that were not susceptible to policy analysis, then the DFE does not apply, the United States has waived sovereign immunity, and this court has subject matter jurisdiction.

The plaintiffs acknowledge that this case is "very similar factually" to *Waverley View Inv'rs, LLC v. United* States, 79 F. Supp. 3d 563 (D. Md. 2015), in which this court held it lacked subject matter jurisdiction because the plaintiff did not carry its burden of proving the United States' waste management decisions at Fort Detrick fell outside the DFE. (Pls.' Opp'n 1, ECF No. 24.) They claim this case is distinguishable from *Waverley* because they have cited "certain documents and directives that were not raised by the plaintiff in [*Waverley*] nor considered by this Court, which would free these Plaintiffs from . . . immunity[.]" (*Id.*) They "would not be opposing this Motion if there were not additional compelling facts for consideration." (*Id.* at 2.) None of the provisions the plaintiffs cite, however, demonstrate that the decisions of the United States regarding its waste disposal or remediation practices in Area B fall outside the DFE.

    I.    Discretionary Nature

        A.  Executive Orders 11507 and 11752

The plaintiffs argue that President Nixon's Executive Order 11507 and Executive Order 11752 were mandatory directives not previously considered by the court. Contrary to the plaintiffs' contention, this court did consider Executive Order 11507 in *Waverley* and found its provisions were closer to "statements of policy goals" than directives and that it was not

sufficiently specific to bind the Army. *See Waverley*, 79 F. Supp. 3d at 570 n.6, 570-71. The plaintiffs concede that Executive Order 11752 is "essentially the same" as Executive Order 11507. (Pls.' Opp'n 11.)

The executive orders did not remove the Army's discretion. Although the plaintiffs point to some provisions in Executive Order 11507 that contain seemingly mandatory language such as "shall," these provisions, when read in context, are not mandatory. For example, Section 4 of Executive Order 11507, which the plaintiffs cite, states that "[t]he use of municipal or regional waste collection or disposal systems shall be the *preferred* method of disposal of wastes from Federal facilities," but when use of such a system is "*not feasible or appropriate*, the heads of agencies concerned shall take necessary measures," including "*[w]hen appropriate*, the installation and operation of their own waste treatment and disposal facilities," "[t]he provision of trained manpower, laboratory and other supporting facilities *as appropriate*," and "*[w]hen appropriate*, preventive measures shall be taken to entrap spillage or discharge or otherwise to prevent accidental pollution." Exec. Order No. 11507 § 4, 35 Fed. Reg. 2573 (Feb. 4, 1970) (emphasis added). Additionally, the plaintiffs note that where no water quality standards are in force or where more stringent requirements are "*deemed advisable* for Federal facilities, the respective Secretary . . . *may* issue regulations establishing . . . water quality standards[.]" *Id*. at § 4(6)(b) (emphasis added).

Even provisions that seem mandatory on their face may not be sufficiently specific to bind the Army to a course of conduct. To prove the Army lacked discretion, the plaintiffs must point to a directive that gave the United States "*specified* instructions that it [wa]s compelled to follow." *Williams v. United States*, 50 F.3d 299, 309 (4th Cir. 1995) (emphasis added). The

plaintiffs argue that the provision stating that "[t]he use, storage, and handling of all materials, including . . . chemical and biological agents, shall be carried out so as to avoid or minimize the possibilities for water and air pollution" is a mandatory order that left no discretion to the Army. *See* Exec. Order No. 11507 § 4(4). But that provision, like the other provisions in the executive orders, does not "specifically prescribe[ ] a course of action for [the Army] to follow" in its waste management procedures. *Berkovitz*, 486 U.S. at 536. Therefore, the executive orders are "far too general to serve as . . . mandatory regulation[s]" for purposes of the DFE. *See Baum*, 986 F.2d at 722 n.2.

### B. Fort Detrick Regulation 385-1

The plaintiffs argue that Fort Detrick Regulation 385-1 ("FD Reg. 385-1") contained mandatory and specific regulations, but the regulation is not mandatory or sufficiently specific to bind the Army. For example, the section concerning treatment of contaminated air fails to specify how air will be treated, only providing that "[a]ir from buildings and safety cabinets in which infectious materials are handled will be treated *in a manner approved by IH & Safety*." (FD Reg. 385-1 at Part A.V.3.b, ECF No. 26 (emphasis added)). The subsection concerning the handling and disposal of refuse is not mandatory, as the first two paragraphs begin with "when size permits," and another paragraph begins with "[a]s a general policy matter." (*Id*. at Part A.V.5.) The plaintiffs quote Part A.V.6.a: "No infectious or toxic substances under investigation at Fort Detrick will be allowed to leave the Detrick drainage system without sterilization," but this provision does not define what substances are "infectious or toxic," nor does it prescribe how Fort Detrick was to sterilize the substances. (*Id*. at Part A.V.6.a.) The next paragraph of that subsection is equally nonspecific by assigning responsibility for sterilization without providing

any additional information about sterilization methods, merely requiring that sterility tests be made "at frequent intervals." (*Id*. at Part A.V.6.b.) The provisions relating to the sterilization and disinfection of toxic materials further demonstrate that the Army retained discretion regarding waste management: Part A.IV.9.a says that processing equipment will be "sterilized *by a method approved or concurred in by IH & Safety*," and Part A.V.1.h states that building surfaces in which infectious substances are handled "will be disinfected with a *suitable* germicide *as often as deemed necessary by the supervisors*," with "[c]hoice of disinfecting material . . . left to the *discretion* of the Unit Supervisor." (*Id*. at Part A. IV.9.a, Part A.V.1.h (emphasis added)). Likewise, Part A.VIII.3 calls for annual building inspections, but it does not provide specific standards and leaves the scheduling of the inspections to the discretion of the Post Inspector. (*Id*. at Part A.VIII.3.)

Even if the regulations were mandatory and specific, the plaintiffs have not alleged how the provisions they list were violated. In fact, by burying waste in Area B, the very activity the plaintiffs challenge in this action, the Army complied with FD Reg. 385-1. For example, Part B.X.2.c says that pesticides, herbicides, and rodenticides are to "be disposed of by Decontamination Branch by burial at the [Area B] Grid Area." (*Id*. at Part B.X.2.c.) Furthermore, Part A.V.5.i states that "[a]s a general policy matter, as much as possible of potentially contaminated materials will be retained within the confines of Fort Detrick" and includes burial at "the Area B burial pit" as one option to achieve that policy. (*Id*. at Part A.V.5.i.) "[I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324.

10

Finally, the plaintiffs have not shown how any violation of FD Reg. 385-1 is connected to the conduct they are challenging or how it caused their injuries. *See Loughlin v. United States*, 286 F. Supp. 2d 1, 18 (D.D.C. 2003) ("To cancel discretionary function immunity, a directive must not only be specific and mandatory, it must also be *relevant* to the claims underlying the suit.") (emphasis in original). For instance, although the plaintiffs cite Part A.VI.4.j, which provides that a supervisor is responsible for ensuring that "no person works alone on an extremely hazardous operation," the plaintiffs do not claim that the Army ever allowed only one person to work on an extremely hazardous operation or that the Army's failure to comply with this regulation harmed them. (Fed. Reg. 385-1 at Part A.VI.4.j.) Similarly, the provision requiring the Director of Medical Sciences Laboratory to process requests for use of vaccines off-post is not relevant because the plaintiffs have not alleged that their claims are related to the unauthorized off-post use of vaccines. (*Id.* at Part A.IV.5.b.) Because the plaintiffs have failed to cite any relevant directive prescribing specific, mandatory waste management or remediation methods, they have not shown that the United States lacked discretion to decide how to dispose of waste and remediate contamination at Fort Detrick.[1]

II.   Susceptibility to Policy Analysis

The plaintiffs have not shown that the Army's waste disposal and remediation decisions were not susceptible to policy analysis. The Army's waste disposal decisions at Fort Detrick involved weighing many factors, including national security priorities, environmental impact, and health concerns. (*See* Curtis Decl. ¶ 13 (use of TCE and PCE were "important part[s] of Fort

---

[1] The congressional hearings testimony the plaintiffs cite, which includes a discussion about shellfish toxin, does not apply to Fort Detrick. Fort Detrick is never mentioned in the plaintiffs' exhibit. (*See* Hearings Testimony, Pls.' Opp'n Ex. 4, ECF No. 24-4.) Moreover, the reference to shellfish toxin is not relevant here, where the plaintiffs have not alleged that any plaintiffs were poisoned by shellfish toxin.

Detrick's biological warfare mission"); *see also* Statement on Chemical and Biological Defense Policies and Programs, Mot. Dismiss Ex. 16, ECF No. 20-19 (renouncing the use of lethal biological agents and weapons because of the risk of "produc[ing] global epidemics and impair[ing] the health of future generations" and directing the DoD to "make recommendations as to the disposal of existing stocks of bacteriological weapons")). "The nature of the military's function requires that it be free to weigh environmental policies against security and military concerns." *OSI, Inc. v. United States*, 285 F.3d 947, 953 (11th Cir. 2002).

The Army's remediation decisions also were susceptible to policy analysis. In its Public Health Assessment of Fort Detrick Area B Groundwater, the Agency for Toxic Substances and Disease Registry concluded that PCE and TCE were the only "contaminant[s] of public health concern." (Public Health Assessment 49.) The Army's remediation efforts, in which it focused on these two substances, were grounded in policy considerations, as the Army balanced environmental impact, health, public safety, regulatory oversight, and resource constraints. *See, e.g., Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1541 (10th Cir. 1992) (finding "little doubt" that the Army's toxic waste cleanup efforts at Rocky Mountain Arsenal "involved policy choices of the most basic kind" because the Army faced "a monumental task" in cleanup and remediation of hazardous waste, which required determining how best to "contain[ ] the spread of contamination . . . while still protecting public health"). The Army's waste disposal and remediation decisions that the plaintiffs challenge are the kinds of policy choices "the discretionary function exception was designed to shield." *See Berkovitz*, 486 U.S. at 536. Accordingly, the plaintiffs have not carried their burden of showing that the Army's waste management decisions were of the kind not susceptible to policy analysis. The DFE applies, and the court does not have subject matter

jurisdiction over this case.

## CONCLUSION

For the reasons stated above, the court will grant the government's motion to dismiss.

A separate order follows.

<u>August 11, 2016</u>　　　　　　　　　　　_____/S/_____
Date　　　　　　　　　　　　　　　　　　Catherine C. Blake
　　　　　　　　　　　　　　　　　　　　United States District Judge